## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOHN TAYLOR,

       Plaintiff,

       v.

CYNTHIA GARCIA and
WEXFORD HEALTH SOURCES, INC.,

       Defendants.

Case No. 11 C 7386

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

This action arises from the repeated lapses in the provision of Elavil (a pain medication) over the course of years to Plaintiff John Taylor while he was incarcerated at Stateville Correctional Center ("Stateville"). Plaintiff, through 42 U.S.C. § 1983, brings deliberate indifference claims under the Eighth Amendment against Defendants Cynthia Garcia and Wexford Health Sources ("Wexford"). Defendants now move [213] for summary judgment. The motion is granted in part and denied in part.

## I.     Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party, here, Plaintiff. *CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

## II. Facts[1]

The State of Illinois contracts with Wexford, a private corporation, to provide health care to inmates in Illinois Department of Corrections ("IDOC") prisons, such as Plaintiff John Taylor who is housed at Stateville. DSOF ¶ 5; PSOF ¶ 42. Cynthia Garcia is a Wexford nurse employed at Stateville. DSOF ¶ 69. Nurse Garcia became Stateville's Director of Nursing in late 2011, and was Stateville's Nursing Supervisor for the preceding two to three years. DSOF ¶ 65. Plaintiff, among other ailments, suffers chronic hip pain, called "neuropathic pain," from nerve damage caused by surgeries and radiation from a prior cancer treatment. PSOF ¶¶ 1-2.

Beginning on November 4, 2009 and at all relevant times, Plaintiff was prescribed Elavil, a pain medication, to alleviate his neuropathic pain. DSOF ¶ 10; PSOF ¶¶ 3-4. Elavil is designated as a "watch-take" drug at Stateville, meaning

---

[1] The facts are taken from the parties' Local Rule 56.1 statements and the exhibits thereto. "DSOF" refers to Defendants' statement of undisputed facts [214], with Plaintiff's responses [217]. "PSOF" refers to Plaintiff's statement of additional facts [222], with Defendants' responses [229].

that a nurse is supposed to deliver each dose to the inmate and then watch the inmate take and swallow the pill. DSOF ¶¶ 14, 58, 71, 106. Plaintiff estimated that taking Elavil may reduce his pain levels from severe (7 or 8, presumably on a scale of 10) to moderate (4 or 5). DSOF ¶ 15. Conversely, even a single missed dose of Elavil will cause Plaintiff to experience more pain than had he taken the drug and sleep deprivation. PSOF ¶¶ 3-4. This action concerns the lapses in Elavil provision, that is, those repeated times when Stateville nurses failed to dispense Elavil to Plaintiff as they were supposed to do.

There is no dispute at summary judgment that Plaintiff should have received Elavil throughout November 4, 2009 to at least March 19, 2013 (when his operative complaint was filed). Yet, as the below table shows, Plaintiff, according to his Medication Administration Records, did not receive Elavil for more than 165 days during that period.

| Lapse Beginning | Lapse End | Duration |
|---|---|---|
| 11/4/2009 | 2/10/2010 | 99 days |
| 2/23/2010 | 2/23/2010 | 1 day |
| 2/25/2010 | 2/26/2010 | 2 days |
| 3/1/2010 | 3/6/2010 | 6 days |
| 3/8/2010 | 3/14/2010 | 7 days |
| 3/17/2010 | 3/19/2010 | 3 days |
| 3/22/2010 | 3/24/2010 | 3 days |
| 10/1/2010 | 10/6/2010 | 6 days |
| 10/9/2010 | 10/13/2010 | 5 days |
| 10/28/2010 | 10/28/2010 | 1 day |
| 10/30/2010 | 10/30/2010 | 1 day |
| 8/15/2011 | 8/18/2011 | 4 days |
| 8/20/2011 | 8/20/2011 | 1 day |
| 8/31/2011 | 8/31/2011 | 1 day |
| 7/28/2012 | 7/28/2012 | 1 day |
| 7/31/2012 | 8/1/2012 | 2 days |
| 8/4/2012 | 8/4/2012 | 1 day |
| 8/6/2012 | 8/24/2012 | 19 days |
| 8/28/2012 | 8/29/2012 | 2 days |
| **Total** | | **165 days** |

DSOF ¶¶ 10, 13; PSOF ¶¶ 17, 21, 24, 29, 33-34, 40. There are more lapses than captured by the table, *see* PSOF ¶ 58, but they were not expressly identified in the Local Rule 56.1 statements and, in any event, this Court need not identify them to resolve Defendants' summary judgment motion. Moreover, while the Medication Administration Records are intended to be a comprehensive record of when medication is dispensed to an inmate, *see* PSOF ¶¶ 17, 21, 24, 29, 33-34, Plaintiff disputes the accuracy of his records. Defendants agree, albeit to a lesser extent. For example, Nurse Garcia testified that, based on her review of Plaintiff's October 2010 Medication Administration Record, the nurse who recorded dispensing Elavil

to Plaintiff on October 7 and 8, 2010 was "inaccurate" because the drug was unavailable or out of stock on those days, as shown by the drug's unavailability on the immediately preceding and following days. PSOF ¶ 25.

To remedy these lapses, Plaintiff alerted medical and prison officials to them, either in person or through letters, and filed multiple grievances. On March 22, 2010, for example, Plaintiff wrote what he said was his "third letter" (the first two are not in the record) to Wexford Chairman Kevin Halloran about not receiving Elavil. PSOF ¶ 23; 3/22/10 Letter [218-1], with Bates No. TAYLOR 000013. Plaintiff recounted his initial lapse and said he had not received Elavil since February 22, 2010. 3/22/10 Letter [218-1]. The record does not show whether Halloran received this letter.

On July 8, 2010, Plaintiff wrote to "Nurse Garcia, Director of Nursing," informing her of his conversation with Dr. Parthasarathi Ghosh, Stateville's then-Medical Director, the day before. 7/8/10 Letter [214-8], with Bates No. TAYLOR 000027. As recounted in the letter, Plaintiff told Dr. Ghosh that he had not received his full Elavil dose on July 5 and 6, 2010, and more generally noted his "problems receiving my medication (Elavil) every [day] since … November 4th, 2009." *Id.* Dr. Ghosh responded that Nurse Garcia, not him, was responsible for disciplining nurses "for not doing their jobs," and advised Plaintiff to contact her. *Id.* Plaintiff thus said he was writing to Nurse Garcia based on Dr. Ghosh's advice. *Id.*

On September 24, 2011, Plaintiff filed a grievance (#M178) complaining that Nurse Deanna Williams did not dispense his Elavil on September 19, 2011. 9/24/11

Grievance [218-2], with Bates No. TAYLOR 000349. On August 29, 2012, the Grievance Officer denied the first of four grievances filed by Plaintiff, finding: "Per C. Garcia, DON, grievant received his Elavil on 9/19/11." 8/29/12 Grievance Officer's Report [218-2], with Bates No. TAYLOR 000350.

On October 2, 2011, Plaintiff filed a second grievance (#M252) again complaining that he did not receive Elavil. 10/2/11 Grievance [218-2], with Bates No. TAYLOR 000351. This time, according to Plaintiff, Nurse Athena Rossiter did not dispense Elavil to him on October 2, 2011. *Id.* Plaintiff added that Nurse Rossiter also had not dispensed Elavil to him in July 2010, and that Elavil helps Plaintiff manage his pain and sleep. *Id.* Again on August 29, 2012, the Grievance Officer denied the grievance, finding: "Per C. Garcia, DON, grievant did receive his Elavil on 10/2/11 per the MAR as verified by staff initials." 8/29/12 Grievance Officer's Report [218-2], with Bates No. TAYLOR 000352.

On October 29, 2011, Plaintiff filed a third grievance (#M337) complaining that, on October 29, 2011, an unknown nurse gave him a 100 mg tablet of Elavil when Plaintiff only should have received a 50 mg tablet. 10/29/11 Grievance [218-2], with Bates No. TAYLOR 000353. Plaintiff inferred that the nurse had given him someone else's Elavil tablet and requested that the nurse be disciplined. *Id.* Again on August 29, 2012, the Grievance Officer denied the grievance, finding: "Per C. Garcia, DON, grievant received his correct dosage of Elavil on 10/29/11." 8/29/12 Grievance Officer's Report [218-2], with Bates No. TAYLOR 000354.

The fourth grievance (#M844) is not in the record. This Court infers from the Grievances Officer's response that the fourth grievance was filed on or before March 28, 2012 and regards Plaintiff not receiving Elavil on March 13, 2012. 8/29/12 Grievance Officer's Report [218-2], with Bates No. TAYLOR 000364. This grievance too was denied on August 29, 2012, with the Grievance Officer finding: "Per C. Garcia, DON, grievant received his Elavil on 3/13/12 per the MAR as verified by staff initials." *Id.*

On April 15, 2012, Plaintiff again wrote to "Nurse Garcia, Director of Nursing." 4/15/12 Letter [214-8], with Bates No. TAYLOR 000071. Plaintiff said that he did not receive any Elavil on April 13, 14 and 15, 2012, and that, earlier that month, Plaintiff had received someone else's Elavil tablet. *Id.* Plaintiff again informed Nurse Garcia of the pattern of Elavil lapses: "I have been trying to receive my medication as prescribed for over two years, and the problem continues." *Id.*

The final letter relevant here is dated April 19, 2012. 4/19/12 Letter [214-8], with Bates No. TAYLOR 000073. Plaintiff wrote to the "Director of Nursing," who was Nurse Garcia, informing her of recent Elavil lapses. *Id.*

## III. Analysis

### A. Nurse Garcia

To prove a claim for denial of medical care, Plaintiff must show: (1) that he had an objectively serious medical condition; (2) that Nurse Garcia knew of the condition and was deliberately indifferent to treating Plaintiff; and (3) that this indifference caused Plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th

Cir. 2010). Under the second prong, which is the only disputed element here at summary judgment, Nurse Garcia must have had subjective knowledge of the risk to Plaintiff's health, and she also must have disregarded that risk. *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). Evidence that the official acted negligently is insufficient to prove deliberate indifference. *Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998). Rather, "deliberate indifference" is a synonym for "intentional or reckless conduct," and "reckless" describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999). Circumstantial evidence is appropriate proof of deliberate indifference. *Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005).

Nurse Garcia disputes both that she had the requisite subjective knowledge and, if so, that she acted with deliberate indifference. This Court considers both arguments in turn, and concludes that Plaintiff has satisfied his burden at the summary judgment stage of the proceedings.

### 1. Subjective Knowledge

Plaintiff has propounded three categories of evidence that create a triable issue of fact as to Nurse Garcia's knowledge that Plaintiff suffered repeated lapses in Elavil and, consequently, was in pain. First, the most direct evidence of Nurse Garcia's purported knowledge comes from Plaintiff's testimony that he had a "number of conversations" with her about his Elavil lapses. Taylor Decl. ¶¶ 2-5 and Taylor Dep. at 96-97, both cited at PSOF ¶ 52. While the dates of these

conversations are not given (though some may have occurred on or about summer 2010, if not earlier, *compare* 7/8/10 Letter [214-8], with Bates No. TAYLOR 000027 (referencing a 7/6/10 conversation with Dr. Ghosh), *with* Taylor Decl. ¶ 2 (appearing to reference the same conversation)), Plaintiff otherwise has described the conversations in detail. Plaintiff explained that, while waiting in the Healthcare Unit to see a doctor, he would see Nurse Garcia and initiate conversations with her about his Elavil lapses. Taylor Decl. ¶ 2. On various occasions, Nurse Garcia, referring to the Elavil lapses, said: "I will take care of it," "I will check on it," or "I received your letter, I'm working on it." Taylor Decl. ¶¶ 2-3, 5. Nurse Garcia, for her part, did not "recall" ever having conversed with Plaintiff about his Elavil lapses. Response to DSOF ¶ 97 (citing Garcia Dep. at 179). Even had Nurse Garcia outright denied ever having had such conversations with Plaintiff, there nonetheless still would be a triable issue of fact.

Second, Plaintiff also testified that, in one of his conversations with Nurse Garcia, she acknowledged receiving Plaintiff's letters about his Elavil lapses. PSOF ¶ 51. Plaintiff wrote letters to Nurse Garcia, addressed to her by name or title, on July 8, 2010, April 15, 2012 and April 19, 2012. PSOF ¶ 51; Letters [214-8], with Bates Nos. TAYLOR 000027, 000071 and 000073. All three letters identified recent Elavil lapses.

Even assuming that Nurse Garcia did not tell Plaintiff that she received his letters, as she argues, DSOF ¶¶ 89, 93, 96-97, the fact that some of the letters are addressed to her creates an inference of knowledge—though perhaps not a strong

enough inference to survive summary judgment on its own. Nurse Garcia explained that she "usually" did not receive letters from inmates, even when addressed to her. DSOF ¶ 89. For letters addressed to the Director of Nursing, such as Plaintiff's April 19, 2012 letter, the Health Care Unit Administrator received them and chose who would respond. Response to DSOF ¶ 91. When Nurse Garcia did receive a letter, her practice was to write on the letter if she addressed the issue herself and, until recently, have the Medical Records Office place the letter in the inmate's file. DSOF ¶ 90. None of the letters here have Nurse Garcia's writing on them, which suggests—but does not conclusively establish—that Nurse Garcia never saw them.

Sending letters to a prison official, even without proof of receipt, can create a triable issue of fact as to knowledge depending on their content and manner of transmission. *Vance v. Peters*, 97 F.3d 987, 993-94 (7th Cir. 1996); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Instructive are two cases from this District also involving the deprivation of medication to Stateville inmates. In *Hardy v. Hardy*, No. 10-5921 (N.D. Ill. Aug. 29, 2013) (Dkt. 215) (unavailable on LexisNexis and Westlaw), the inmate required medical care from a dentist to treat a cavity and gum infection causing severe pain, and, similar to here, addressed three letters to Dr. Ghosh, the Medical Director at Stateville, alerting him to the problem. *Hardy Op*. at 23. Dr. Ghosh denied that the inmate's letters created a culpable state of mind, arguing, like Nurse Garcia here, that the inmate failed to show that Dr. Ghosh "actually received" them. *Id*. The Court rejected the argument. *Id*. at 22-24. Like Nurse Garcia, Dr. Ghosh testified only that he could not recall the

letters and not that he never received them, thereby creating a genuine issue of fact for trial. *Hardy Op.* at 24.

Likewise, in *Gallo v. Ghosh*, No. 08-6974, 2013 WL 5587081, at *1-2 (N.D. Ill. Oct. 10, 2013), another Stateville inmate sued Dr. Ghosh for failing to timely dispense his medications. It took Dr. Ghosh one month to prescribe a protein-pump inhibitor recommended by an outside specialist. *Id.* at *2. Once prescribed, Dr. Ghosh failed to correct the dispensation of the wrong medication to the inmate, despite the inmate, as here, "mailing letters to Dr. Ghosh, filing administrative grievances, and hand-delivering dozens of letters to medical staff." *Id.* at *2-3. The Court denied Dr. Ghosh's summary judgment motion, emphasizing the letters and grievances as supplying the "strongest indication of [his] deliberate indifference." *Id.* at *3.

Defendants cite, by comparison, *Johnson v. Synder*, 444 F.3d 579 (7th Cir. 2006), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013), where the inmate's letter to the defendant Donald Synder, IDOC's Director, did not create a triable issue of fact as to Snyder's knowledge. Like Dr. Ghosh in *Hardy*, there was no evidence that Synder had read the letter. *Johnson*, 444 F.3d at 584. Unlike in *Hardy* where Dr. Ghosh did not recall receiving the letter, however, the record in *Johnson* affirmatively showed that Synder never received the letter. An uncontroverted affidavit from the IDOC's Office of Inmate Issues explained that Synder did not personally receive inmate correspondence

related to grievances, but instead delegated that task to subordinates. *Johnson*, 444 F.3d at 584.

The facts here fall somewhere between *Hardy* and *Johnson*, where the Courts reached different outcomes on summary judgment based upon the record before them. While there is no evidence that Nurse Garcia would not, as a matter of policy, have received any of Plaintiff's three letters as in *Johnson*, her testimony shows, unlike in *Hardy*, that she probably did not receive the letters. DSOF ¶¶ 89-91. Given the other evidence of knowledge in the record, however, this Court need not decide whether the letters to Nurse Garcia, on their own and setting aside her purported admission that she received them, create a triable issue of fact.

Third, Nurse Garcia participated in the resolution of Plaintiff's grievances. As part of her job description, Nurse Garcia assisted in the resolution of inmate grievances. PSOF ¶¶ 47, 54. On August 29, 2012, the Grievance Officer answered four of Plaintiff's grievances with information that came from: "C. Garcia, DON." PSOF ¶ 53. In the grievances, Plaintiff described specific lapses in his Elavil provision and sometimes also the resulting "pain" and "sleep deprivation" he suffered. Grievances [218-2], cited at PSOF ¶ 53. While the mention of Nurse Garcia's name in the grievance responses does not prove that she reviewed the grievances themselves or had knowledge of the Elavil lapses, it is, as shown in *Hardy* (at pages 14 and 15) and *Gallo* (2013 WL 5587081, at *1-2), another circumstantial piece of evidence for the jury to consider at trial.

Nurse Garcia cites the Seventh Circuit's unpublished decision in *Williams v. Guzman*, 346 F. App'x 102 (7th Cir. 2009), which also involved the provision of Elavil. In *Williams*, the Seventh Circuit affirmed summary judgment for the defendant prison doctors. The case is readily distinguishable. As here, there were delays in the provision of Elavil in *Williams*, but, unlike here, there was no evidence that the doctors knew of the delays as required to maintain a deliberate indifference cause of action against them. *Id.* at 105-06.

### 2. Deliberate Indifference

Having established that there is a triable issue of fact as to Nurse Garcia's knowledge, this Court next considers whether she acted with deliberate indifference. Nurse Garcia primarily argues that she had no role in ordering Elavil and that other medical personnel, not her, failed to dispense Elavil to Plaintiff. The flaw in Nurse Garcia's argument, however, is that she can be liable even without having directly participated in the medication deprivation. In *Gentry*, 65 F.3d at 561, which Defendants themselves cite, the Seventh Circuit found that deliberate indifference attaches when a prison officials knows of the unconstitutional conduct and facilitates, approves, condones or turns a blind eye to it. *See also Vance*, 97 F.3d at 993. In *Reed v. McBride*, 178 F.3d 849, 851-52 (7th Cir. 1999), the Seventh Circuit cited *Vance* (which, in turn, cited *Gentry*) to find that the only reason why the defendants, the prison's superintendent and the Commissioner and Regional Director of the Indiana Department of Corrections, could be liable, even though they

were not personally responsible for the inmate's medical care, was because they received the inmate's letter complaints.

With an affirmative obligation to act, the question remains here whether a reasonable jury could make a finding of deliberate indifference based upon Nurse Garcia's actions (or allegedly willful inactions) after she purportedly learned of Plaintiff's Elavil lapses. A jury could reach that conclusion for at least three reasons. First, this is the "prototypical case" of deliberate indifference because, as in *Reed*, 178 F.3d at 854-55, the inmate did not receive his prescribed medications, repeatedly requested aid from the defendant prison officials through letters and grievances, received no aid and suffered injury. *See also Ralston v. McGovern*, 167 F.3d 1160, 1161-62 (7th Cir. 1999) (deprivation of prescribed pain medication was a "gratuitous cruelty").

Second, deliberate indifference reasonably can be inferred from Nurse Garcia's alleged hostile retort in one conversation with Plaintiff. *See Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005); *Gil v. Reed*, 381 F.3d 649, 661-62 (7th Cir. 2004); *Wilder v. Wexford Health Sources, Inc.*, No. 11-4109, 2015 WL 2208440, at *9-10 (N.D. Ill. May 8, 2015) (Blakey, J.). Plaintiff claims that, in one face-to-face conversation, he told Nurse Garcia that another nurse had broken her promise to return to Plaintiff's cell with his missing Elavil, and Nurse Garcia sarcastically responded that the nurse never should have told Plaintiff that she would come back. PSOF ¶ 52. A reasonable jury thus may infer that Nurse Garcia did not care whether nurses dispensed Plaintiff's prescribed medications to him. Likewise, the

defendant nurse in *Greeno* told the inmate that he would be "locked up" if he continued to complain about not receiving medication for an esophageal condition. 414 F.3d at 654. Animosity thus may show deliberate indifference.

Third, in her role as a supervisor, Nurse Garcia purportedly had knowledge that Plaintiff and other inmates were not receiving watch-take medicines, such as Elavil, yet chose not to investigate or rectify the problem, such as by retraining or disciplining her nurses for that misconduct. PSOF ¶¶ 44, 49-50, 55-57. The record shows that Nurse Garcia had clinical responsibility over all nurses, whether employed by IDOC or Wexford, including the responsibility to correct nurses' failures to administer medicine. PSOF ¶¶ 46-48. These facts, if true, supply a reasonable basis for a jury to find that Nurse Garcia at least condoned or turned a blind eye to the constitutional violations. *Jones*, 856 F.2d at 992-93; *Gentry*, 65 F.3d at 561. Under analogous circumstances, the Court denied summary judgment in *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 989-90 (N.D. Ill. 2012).

In *Flournoy*, as here, the defendant prison official (again Dr. Ghosh) argued that he was not responsible for the medication lapses. Dr. Ghosh wrote the inmate's prescriptions and argued that, once written, the matter was out of his hands, because filling and dispensing the prescriptions were handled by other medical personnel and the off-site pharmacy. *Id.* at 989. The Court denied that argument, finding an issue of material fact as to whether Dr. Ghosh bore some responsibility to ensure that inmates received medications without undue delay. *Id.* at 989-90. The Court emphasized that the IDOC's contract with Wexford made Dr.

Ghosh, as Stateville's medical director, responsible for coordination of health care at the prison. *Id.* at 989. Dr. Ghosh could not escape that responsibility at the summary judgment stage, and neither can Nurse Garcia, who had the power to correct nurses' failures to administer medicine.

Even assuming Nurse Garcia lacked the power to remedy Plaintiff's Elavil lapses herself, that would not excuse her from action. At a minimum, Nurse Garcia could have told her supervisors about the Elavil lapses. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). Based upon the record, she does not appear to have done even that. In *Berry*, 604 F.3d at 443, the inmate required dental care, and the Seventh Circuit rejected the defendant nurse's argument that he could not be held liable because he lacked the authority to refer the inmate to a dentist without further approval. The Court explained that, as here, the nurse "always" had the ability to contact supervisory personnel about the inmate's care. *Id.* So did Nurse Garcia.

One final point bears noting. Even though she may have known as early as summer 2010 that there was a problem at Stateville with inmates not receiving their medications, *see* PSOF ¶¶ 44, 49-50, Nurse Garcia lacks the requisite personal involvement to be liable for Plaintiff's Elavil lapses that occurred before she acquired personal knowledge of them. *Luck v. Rovenstine*, 168 F.3d 323, 325, 327-28 (7th Cir. 1999); *McKinnie v. Dart*, No. 14-9588, 2015 WL 5675425, at *3 (N.D. Ill. Sept. 24, 2015) (Blakey, J.); *Sutton v. Ghosh*, No. 10-8137, 2015 WL 5461663, at *9-10 (N.D. Ill. Sept. 16, 2015). Thus, Nurse Garcia may not be liable for all the Elavil

lapses, such as the initial and longest lapse from November 4, 2009 to February 10, 2010. Of the relevant letters and grievances purportedly seen by Nurse Garcia, the earliest is dated July 8, 2010, months after this initial lapse. 7/8/10 Letter [214-8], with Bates No. TAYLOR 000027. Plaintiff's purported face-to-face conversations with Nurse Garcia may have been earlier, but he does not say when they occurred. *See* Taylor Decl. ¶¶ 2-5, cited at PSOF ¶ 52. The dates of these conversations can be clarified at trial if necessary.

Once Nurse Garcia learned that there was a pattern of lapses, she may be deliberately indifferent for subsequent lapses. *Reed*, 178 F.3d at 854-55. In *Reed*, the Seventh Circuit found a triable issue as to the defendant prison officials' deliberate indifference based on a similar recurring pattern of medication deprivation. On "many" occasions over two years, the inmate received treatment at an outside hospital on Fridays but could not retrieve his identification badge upon returning to the prison. *Id.* at 851. The inmate only received his badge the following Monday or Tuesday. *Id.* Without the badge, the inmate could not receive food or medication from prison authorities. *Id.* The inmate sent three letters to the prison officials (dated October 14, 1994, October 24, 1995 and April 26, 1996) notifying them of the problem, and the prison officials, at summary judgment, acknowledged receiving the first and third letters. *Id.* at 854. In response to the first letter, the prison officials said the inmate's concerns were "duly noted" and that the prison's policy would be reviewed. *Id.* at 855. The record did not show what actions, if any, the prison officials took, but the Court found that the inmate's

second and third letters, like Plaintiff's subsequent oral and written complaints to Nurse Garcia here, could lead a jury to conclude that the prison officials had done nothing. *Id.* at 855. The Court added that, upon learning of the medication and food lapses, prison officials had an obligation to investigate and, if necessary, prevent the lapses from happening again. *Id.* at 854-55. Their failure to do so could support an inference of deliberate indifference. *Id.* The same holds true here.

For these reasons, Nurse Garcia's summary judgment motion is denied.

## B. Wexford Health Sources

Plaintiff brings two *Monell* claims against Wexford, alleging that it had unconstitutional policies or practices that caused his Elavil lapses (Subsection 1) and the denial of a cervical pillow and a hot / cold pack (Subsection 2). This Court considers each claim in turn, and grants Wexford's summary judgment motion only as to its purported denial of a cervical pillow and a hot / cold pack.

### 1. Elavil Lapses

A corporation contracting with the State of Illinois, such as Wexford, can be liable under Section 1983. *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008); *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). To prevail on his *Monell* claim, Plaintiff must show that he suffered a constitutional injury and that injury was caused by: (1) an express policy; (2) a widespread practice that is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a person with final policy-making authority. *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008); *see also Monell v.*

*Department of Social Services of City of New York*, 436 U.S. 658, 690-91 (1978). If Wexford has actual or constructive knowledge that its agents probably will violate constitutional rights, then it may not adopt a policy of inaction. *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012).

This case falls squarely within *Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006), so denial of summary judgment is warranted here. The Seventh Circuit in *Davis* denied summary judgment for defendant Cook County based on the absence of policies or procedures to verify an inmate's outpatient methadone treatment program and ensure that the inmate received timely care. *Id.* at 692-93, 695. The Court found that, absent those policies or procedures, inmates at Cook County Jail fell through the cracks and did not always receive methadone treatment. *Id.* at 692-93. Supporting that decision was the testimony of a Cook County pharmacist about the absence of policies and procedures, and testimony from a Cook County correctional officer and a physician assistant about the widespread delays in methadone treatment. *Id.* at 692-93, 695.

Similarly in *Fox v. Peters*, No. 09-5453, 2011 WL 6378826, at *1, 7-8 (N.D. Ill. Dec. 19, 2011), Wexford itself unsuccessfully moved for summary judgment on a *Monell* claim. The Court found that there was a material issue of fact as to whether Wexford's failure to establish a written policy governing the distribution of medication to inmates at Stateville led to the medication provision lapses at issue. *Id.* at *7-8. A trial therefore was required in *Fox*, and in the case here.

As in *Davis* and *Fox*, here, there is an apparent absence of Wexford policies and procedures to ensure that prescriptions are recorded on the Medication Administration Records and dispensed correctly. *See, e.g.*, PSOF ¶¶ 44-45, 50, 60-62, 66. This problem was widespread and not limited to Plaintiff. IDOC Quality Improvement Study Reports on the delivery of psychotropic medications showed repeated months of "inconsistent documentation" on the Medication Administration Records, with compliance at: (1) 73 percent in September 2011, (2) 76 percent in October 2011, (3) 97 percent in December 2011 and (4) 59 percent in May 2012. PSOF ¶ 44. These studies measured how frequently psychotropic drugs were delivered and how often "the distributions [were] documented properly in the Medication Administration Record." Quality Improvement Study Reports [218-3], with Bates Nos. IDOC 002990-91 and IDOC 003332-33. Consistent with the Reports, and like the correctional officer in *Davis*, Nurse Garcia found from her own audit of Medication Administration Records that many—possibly more than half—contained charting errors in 2009 and 2010. PSOF ¶ 50.

Wexford argues that the IDOC is at fault, but, given that both shared health care responsibilities at Stateville, that argument is for a jury to decide and not this Court at summary judgment. Wexford in fact admits that the operation of the Healthcare Unit at Stateville was a "joint process" with the IDOC. [230] at 10. Plaintiff responds that Wexford had an obligation to ensure that Stateville inmates received their medications even when IDOC employees, and not Wexford employees, were responsible for the medication lapses. In support, Plaintiff cites Wexford's

2005 to 2011 contract with the State of Illinois, which provides that Wexford "shall arrange for the provision of medical services to IDOC inmates," and "shall ensure that all medical services are provided in accordance with medically accepted community standards of care." PSOF ¶ 42. Plaintiff also cites Wexford's Operations Policies and Procedures, Policy No. P-128, titled "Medical Services," which requires that Wexford "ensure that medications are provided in a timely, safe and sufficient manner." PSOF ¶ 43. Wexford denies that Policy No. P-128 "governs the entire actions or conduct of Wexford relative to the provision of medications at Stateville Correctional Center." Response to PSOF ¶ 43 (citing DSOF ¶¶ 69, 101, 103-04). But DSOF ¶¶ 69, 101, 103 and 104 only show that conflicting IDOC policies trump Wexford policies and that the IDOC had certain unspecified policies governing medication distribution and administration. DSOF ¶¶ 69, 101, 103 and 104 do not show that any IDOC policy conflicts with Wexford's contractual obligations and Policy No. P-128. Ultimately, the scope of each party's responsibilities will be decided by a jury. For these reasons, Plaintiff can proceed to trial against Wexford on its *Monell* claim regarding the Elavil lapses.

### 2. Cervical Pillow and Hot / Cold Pack

Plaintiff's last claim against Wexford is that he suffers pain from the company's decision not to provide him with a cervical pillow and a hot / cold pack. PSOF ¶ 74. On July 23, 2010, an outside spine specialist recommended both devices for Plaintiff's neck and back pain. Four days later, Dr. Ghosh signed off on that recommendation. PSOF ¶ 69. Almost two years later, in June 2012, Plaintiff

requested a new cervical pillow and a replacement hot / cold pack, and Dr. Saleh Obaisi, Stateville's then-Medical Director, signed a Medical Permit for Plaintiff to have both.  PSOF ¶¶ 70-71.  On November 9, 2012, Dr. Obaisi signed a Medical Special Services Referral and Report noting that a cervical pillow and hot / cold pack had been recommended to Plaintiff by a specialist.  PSOF ¶ 72.  At a December 4, 2012 "collegial review" between Dr. Obaisi and Dr. David Haymes (Wexford's dedicated utilization management physician), however, Wexford discontinued providing Plaintiff with a cervical pillow and a hot / cold pack as "not medically necessary."  DSOF ¶ 123; PSOF ¶ 73.  They recommended that Plaintiff use a rolled up towel instead.  PSOF ¶ 73.

Based upon this factual record, Wexford's summary judgment motion is granted.  Plaintiff fails to show that there is any triable issue of fact as to any of the three methods for proving a *Monell* claim.  *See Klebanowski*, 540 F.3d at 637.  There is no evidence, for example, that the denial of the cervical pillow and the hot / cold pack were the manifestation of an unconstitutional policy or widespread practice at Wexford.  Plaintiff instead argues that Dr. Haymes should not have departed from the spine specialist's prior recommendation (then more than two years old).  While that fact might contribute to a potential claim against Dr. Haymes personally, it does not support a *Monell* claim against Wexford.  Confirming this point, Plaintiff only cites cases about doctors who may have been deliberately indifferent for rejecting treatment recommendations from specialists—not *Monell* claims against municipalities and corporations, which have a different standard.  [221] at 18, citing

*Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999), and *King v. Chapman*, 4 F. Supp. 3d 1017, 1039-40 (N.D. Ill. 2013).

For these reasons, Plaintiff cannot proceed to trial against Wexford on his *Monell* claim regarding the denial of a cervical pillow and a hot / cold pack.

## IV. Conclusion

Defendants' motion for summary judgment [213] is granted in part and denied in part.

The October 29, 2015 status hearing is stricken, and hereby reset to October 15, 2015, at 9:45 a.m., in Courtroom 1725. The parties should meet and confer in advance of the status hearing and come prepared to select a trial date in February or March 2016 and address related issues, including the expected length of trial.

Any *Daubert* motions the parties may wish to file shall be briefed as pre-trial motions *in limine*, and this Court will set a schedule for pretrial motions and the proposed pretrial order at the forthcoming status hearing.

Dated: October 6, 2015

Entered:

_____
John Robert Blakey
United States District Judge